Julia Weingrad, w/o Leon, Deceased, and Barbara Weingrad, w/o Leon and Natural Guardian for Michael & Aaron Weingrad v. Byberry State Hospital. Workmen's Compensation Appeal Board of the Commonwealth of Pennsylvania. Julia Weingrad and Barbara Weingrad, Appellants.

Argued June 10, 1976, before President Judge Bow-MAN and Judges CRUMLISH, JR., and BLATT, sitting as a panel of three.

*Charles F. Quinn,* for appellants.

*Stephen E. Levin,* Special Assistant Attorney General, with him *James N. Diefenderfer,* for appellees.

OPINION BY JUDGE CRUMLISH, JR., September 15, 1976:

Julia Weingrad and Barbara Weingrad, natural guardian for Michael and Aaron Weingrad (Appellants), appeal the order of the Workmen's Compensation Appeal Board (Board) which reversed[1] an order

---

[1] Chairman Herskovitz and Commissioner McCullough constituted the majority seeking to reverse the referee. Commissioner Culbertson filed a written dissent and would affirm the award of benefits.

of the referee granting benefits upon the respective fatal claim petitions filed by Appellants.[2]

The factual posture of this most bizarre case was ably set forth by the referee in his exhaustive and most well-reasoned decision constituting twenty-three pages in length. Summarizing those facts, the referee entered the following findings of fact:

"1. Decedent, Dr. Leon Weingrad, was employed as a Staff Physician at the Byberry State Hospital, Defendant, on and prior to August 29, 1971; at weekly earnings sufficient to allow maximum compensation.

"2. From the evidence regarding the nature of Claimant's position as a Staff Physician at the Hospital, rendering medical treatment to its patients, it is reasonable to presume as a fact that Claimant was 'on call' at all times, whether on or off the premises, for consultation by phone or actual services, for any medical emergencies or problems relating to his patients, as a necessary condition of his employment.

"3. On August 29, 1971, Dr. Leon Weingrad was shot and killed by Gloria Burnette, an ex-employee of the Defendant Hospital, acting on behalf of, and under the strong domination of Dr. Lois Farquaharson, an employee of the Hospital, while Dr. Weingrad was in the course of his employment with the Defend-

---

[2] On March 30, 1973, a petition was filed by Barbara Weingrad, on her own behalf, alleging that she is the dependent widow of Dr. Leon Weingrad, who was killed in a work-related accident on August 29, 1971, at a time when his earnings were sufficient for the maximum allowance of compensation. This petition was later amended to include as beneficiaries two dependent minor children residing in the same household with Dr. Weingrad and his widow, namely, Michael Weingrad and Aaron Jay Weingrad. On June 22, 1973, a petition was filed by Julia Weingrad, on her own behalf, alleging that she is the dependent widow of Dr. Leon Weingrad, who was killed in a work-related accident on August 29, 1971, at a time when his earnings were in excess of the maximum allowance of workmen's compensation.

ant; said killing taking place on the parking lot of his residence at Society Hill Towers, Phila., Pa.

"4. The work-related motive for the killing of Dr. Weingrad by said Gloria Burnette,—acting for Dr. Farquaharson,—was the fact that Dr. Weingrad, as a staff doctor for the Defendant, had complained to the superiors of Dr. Farquaharson, his co-employee at the Byberry State Hospital, about her incompetence in the performance of her duties; her neglect of her patients; and her aberrant professional conduct in carrying on a lesbian relationship openly with Miss Burnette, her former patient and later co-employee at the Defendant Hospital.

"5. That after said complaints had been made to Dr. Farquaharson's superiors, as agents of the Defendant Hospital, the said Dr. Farquaharson and her lesbian lover, Gloria Burnette, made open threats at the Hospital and elsewhere, that they would 'get even' with Dr. Weingrad; that they would get the 'Black Panthers' after him; and that they would kill him,— because of his complaints which endangered the continued employment of Dr. Farquaharson, and the continued relationship between her and Miss Burnette.

"6. That the failure of Dr. Farquaharson's superiors, as agents of the Defendant, to take any action against her as a result of the complaints made by Dr. Weingrad; their knowledge of the threats of violence against him made by Dr. Farquaharson and Miss Burnette; their knowledge of her aberrant professional and apparently psychotic behavior; and the general nature of Dr. Weingrad's duties in this mental institution, placed the said Dr. Weingrad in a 'peculiar' and 'increased risk' position in his employment at the Defendant Hospital.

"7. That there was a direct and positive causal connection between Dr. Weingrad's employment at the Defendant Hospital and his death which was brought

about by his co-employee, Dr. Farquaharson, through her dominant influence on her companion and lesbian lover, Gloria Burnette.

"8. That Dr. Weingrad's death resulted from his actions on behalf of his employer, the Defendant Hospital; and was causally related to his actual engagement in furthering the business or affairs of his employer.

"9. That Dr. Weingrad's death was not caused by a third person who intended to harm him because of personal reasons not related to his employment; and that the Defendant Hospital failed to present any evidence to establish that his death was caused by such a third person intending to harm him for personal reasons.

"10. That Dr. Weingrad, the decedent, left him surviving a dependent widow, Julia Weingrad; and two dependent minor children who were residing in decedent's household at the time of his death under the care of their mother, Barbara Weingrad,—namely, Michael Weingrad, born April 10, 1969; and Aaron Jay Weingrad, born December 26, 1970.

"11. That the best interests of the said minor children of the decedent would be served by awarding any death compensation benefits due them to their mother, Barbara Weingrad, as their natural guardian."

Cutting through the plethora of factual and legal propositions set forth by the parties, either in justification or opposition to the denial of benefits, it may be stated that the focus of our attention must center on Section 301(c) of The Pennsylvania Workmen's Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §411, which states:

"The terms 'injury' and 'personal injury,' as used in this act, shall be construed to mean only violence to the physical structure of the body, and such disease or infection as naturally results therefrom; and

wherever death is mentioned as a cause for compensation under this act, it shall mean only death resulting from such violence and its resultant effects, and occurring within three hundred weeks after the accident. The term 'injury' by an accident in the course of his employment, as used in this article, (footnote omitted) shall not include any injury caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment; but shall include all other injuries sustained while the employe is actually engaged in the furtherance of the business or affairs of the employer, whether upon the employer's premises or elsewhere, and shall include all injuries caused by the condition of the premises or by the operation of the employer's business or affairs thereon, sustained by the employe, who, though not so engaged, is injured upon the premises occupied by or under the control of the employer, or upon which the employer's business or affairs are being carried on, the employe's presence thereon being required by the nature of his employment.''

And, in particular, the parties point us to the exclusion expressed in the statute limiting awards to persons whose injuries were not ''caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment.''

Our recent interpretation of this section was expressed in *Workmen's Compensation Appeal Board v. Borough of Plum*, 20 Pa. Commonwealth Ct. 35, 340 A.2d 637 (1975). There, we held that the fatal shooting by a fleeing felon of a truck driver, apparently stopped on a side road not regularly traveled in the course of the driver's deliveries, and while he was either eating lunch or urinating, was compensable under the Section 301(c) exclusion.

But more particularly, we there set forth crucial language from *O'Rourke v. O'Rourke,* 278 Pa. 52, 122 A. 172 (1923), which clearly delineated the parameters of the section here in issue. We said:

"The instant factual situation is controlled by the Supreme Court in O'Rourke v. O'Rourke, 278 Pa. 52, 122 A. 172 (1923). There Decedent and his foreman at the end of their normal working day had gone from their place of employment and were proceeding to collect an indebtedness owed to their employer when they were set upon by two inebriates. The injury in dispute arose from the attack. There, as here, the Court concluded that Decedent was in the course of his employment with the question becoming whether acts by third parties causing the injury were compensable. Justice FRAZER interpreted the third party provision of Section 301:

" 'The attack was wholly unpremeditated, due, no doubt, to the intoxicated condition of two of the parties involved. The result of the trouble was an unexpected happening in the course of employment and compensable under Section 301 above referred to, which, after stating the exceptions, provides the term injury by accident in the course of employment "shall include all other injuries sustained while the employee is actually engaged in the furtherance of the interest of the employer, whether upon the employer's premises or elsewhere." An illustration of the application of this rule is found in Hale v. Savage Fire Brick Co., 75 Pa. Super. 454, where compensation was allowed for injuries received by falling while the employee was engaged, during the lunch hour, in playful sport with fellow employees from whom he was attempting to escape. On the other hand, in Cawley v. Express Co., 276 Pa. 160, compensation was refused for injuries resulting from an assault committed by one employee upon another during a quarrel over personal matters not relating to their employment; claimant having sus-

tained his injuries by stumbling from a platform on the employer's premises, while endeavoring to avoid his assailant. The basis of the decision is found in the following extract from the opinion (page 163): "The conflict was solely an individual matter arising from the animosity of the two involved, and in this differs from the case of Hale v. Savage Fire Brick Co., supra, relied on below, which really turned on whether the claimant at the time was in the course of his employment. Clearly, the boy there hurt was not engaged in an encounter arising from personal enmity." *Had there been in the present case previous differences between deceased and the persons who assaulted him, and the attack made for that reason, the rule in Cawley v. Express Co., would apply. No personal animosity existed, however, and the attack, so far as the evidence shows, was without provocation or premeditation, and merely the result of an evil mind excited by an excessive use of liquor. In our opinion, an attack from such source was an unexpected happening in the course of decedent's employment and properly the subject of compensation.'* O'Rourke, supra, 278 Pa. at 55-56, 122 A. at 173." *Workmen's Compensation Appeal Board v. Borough of Plum, supra,* 20 Pa. Commonwealth Ct. at 41-42, 340 A.2d at 640-1. (Emphasis in original.)

*O'Rourke, Borough of Plum,* and cases in the 301 (c) line, dictate that our inquiry be pointed to:

1. Whether Claimant was, in reality, in the course of employment when the injury occurred, *Hale, supra*; and

2. Whether, once in the course of employment, the injury was caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment, *Cawley, supra; Borough of Plum, supra.*

Therefore, the threshold question to be determined in this case is whether Dr. Weingrad was in the course of his employment when shot by the assailant. While the referee and both parties have devoted the majority of their attention to the third party assailant issue, it must first be decided whether decedent was, in reality, in the course of his employment for purposes of Section 301(c).

In this regard, the law dictates that in the event a claimant is on the premises of the employer when injured, he need not be engaged in furthering the employer's business, but if the injury is sustained while off the premises, it must be shown that the employe was actually engaged in his employer's business.

Appellants take the position, as did the referee, that the quarrels and general bad blood between Dr. Farquaharson and Dr. Weingrad, which arose from their employment relationship at Byberry and the interrelationship, both professional and otherwise, at that institution, establish that the death at the hands of Dr. Farquaharson's pawn was *substantially related to the employment*. There can be little doubt that the strains encountered between the two doctors while employed at Byberry formed the basis for, and substantially contributed to, Dr. Weingrad's death. However, that is not the proper inquiry before this Court.

Since Dr. Weingrad was undoubtedly *off premises* when shot, our inquiry must be *whether he was engaged in the employer's business at the time of the shooting,* and not whether the motive of the killing stemmed from a work-related encounter. Such a determination is more appropriately before us in the context of the third party assailant clause of 301(c) which relates to "reasons personal to him," as opposed to ones classified as "work related."

We agree with the Board that there exists no substantial evidence of record to support a finding that

Dr. Weingrad was engaged in Byberry Hospital business at the time of his death. *Universal Cyclops Steel Corporation v. Krawczynski,* 9 Pa. Commonwealth Ct. 176, 305 A.2d 757 (1973). The hospital and its carrier presented no witnesses before the referee while Claimant presented four: (1) a witness to the shooting who was a friend of decedent; (2) a hospital employe familiar with the interrelationship between the two doctors; (3) another hospital employe familiar with the two doctors; and (4) the alleged widow of decedent. It should also be noted that the referee accepted into evidence extensive testimony of the assailant and Dr. Farquaharson given at the murder trial after indictment for killing Dr. Weingrad.

An examination of the testimony reveals that the vast majority introduced on behalf of Claimant was in fact hearsay. The referee, on the basis of Section 422 of the Act, 77 P.S. §834,[3] (providing that the Board not be bound by technical rules of evidence, *e.g.,* hearsay) and decisions such as *Chelden Radio Cab Company v. Workmen's Compensation Appeal Board,* 10 Pa. Commonwealth Ct. 478, 310 A.2d 726 (1973), and *Giordano v. Biano, Inc.,* 204 Pa. Superior Ct. 219, 203 A.2d 396 (1964), (holding that hearsay can be considered if buttressed by otherwise admissible testimony, however, it is clear that the decision cannot be based solely on hearsay) bottomed its findings upon the hearsay. The referee, under decisions in *Buff v. Fetterolf,* 207 Pa. Superior Ct. 92, 215 A.2d 327 (1965), and *Marshall v. Pittsburgh,* 119 Pa. Superior Ct. 189 (1935), also concluded that the hospital's failure to produce witnesses rebutting the motive testimony produced by

---

[3] Section 422 states:

"Neither the board nor any of its members nor any referee shall be bound by the technical rules of evidence in conducting any hearing or investigation, but all findings of fact shall be based only upon sufficient, competent evidence to justify same."

Appellants justified the inference that such testimony would indeed be unfavorable if presented.

We agree with the position taken by the Board's majority with respect to the insubstantiality of evidence sufficient to support findings of fact that decedent was actually "on-call" for Byberry or that decedent was killed in a work-related incident due to the peculiar nature of his position which caused risks to his person at all times. The Board stated:

"At the outset, decedent at the time of his death was not on the premises of the defendant-hospital, was not performing his functions at said hospital, and was on the parking lot of his residence, *preparing to go to his weekend position with the City of Philadelphia.* The 'wife' with whom decedent was living testified that on the date of the killing, her husband was *on duty at the Roundhouse* and he was sleeping late. The Roundhouse was the nickname for the police station where decedent performed his weekend duty for the City of Philadelphia. This case, therefore, is one where clearly the killing occurred off the premises of the employer. The burden was, hence, on the claimant to bring the killing within the course of employment of decedent, that is, that decedent was actually engaged in the furtherance of the business or affairs of the defendant-employer, and that the activity of the decedent was done by the order of the employer express or implied, and not simply for the convenience of the employee.

"Finding of fact #2 recites that 'it is reasonable to presume as a fact that decedent was "on call" at all times, whether on or off the premises, for consultation by phone or actual services, for any medical emergencies or problems relating to his patients, as a necessary condition of his employment.' There is nothing in the record to permit this presumption. In fact, such a presumption is actually negated by the evi-

dence, because decedent at the time was actually engaged in pursuing, or on his way to pursue, or to continue his weekend duties as a police surgeon at the Roundhouse for the City of Philadelphia. Finding of fact #2 must therefore be eliminated as one not based upon substantial competent evidence of record.

"Finding of fact #3 is improper as a finding of fact so far as it states that 'Dr. Weingrad was in the course of his employment with the defendant,' for this is a conclusion of law.

"Finding of fact #4 discussed a work-related motive for the killing, but this finding is not germane to the burden of claimant i.e., to show that decedent was actually engaged in the furtherance of the business of his employer.

"Finding of fact #5 has the same fault as finding of fact #4.

"Finding of fact #6 relates to a 'peculiar' and 'increase risk' position in employment, which is not part of the law of Pennsylvania, and, in any event, said finding of fact is actually a conclusion of law, and cannot be employed to examine the validity of the conclusion that decedent at the time of his killing was in the course of his employment.

"Finding of fact #7 relates a causal connection between employment and death without setting forth what that causal connection was.

"Finding of fact #8 is again of no help because it apparently refers to actions of the decedent regarding his employment which action did not take place on the day of death and again recites the conclusion of law that decedent was furthering the business or affairs of his employer.

"Finding of fact #9 is not necessary to be considered because the other findings of fact do not support the burden placed upon claimant to show that

decedent at the time of his killing was actually engaged in the furtherance of the business or affairs of his employer.

"Even though the referee labored hard, and long and studiously, and in a most admirable manner for the purpose of granting compensation to the innocent economic victims of the bizarre circumstances of this case and the killing, this board finds that the referee, who is the finder of facts, and who passes upon the credibility of the witnesses, even with the abundance of hearsay which he considered in this case, has not found facts, based upon competent and substantial evidence, to support a conclusion that the decedent, shot to death, in the parking lot at his residence, *as he was preparing to resume weekend duties with an employer other than the defendant,* was actually engaged in the furtherance of the business of affairs of said defendant-hospital." (Emphasis added.)

Because we hold that decedent was not engaged in furthering Byberry Hospital's business at the time of death, albeit that the motive for the killing can be classified as work-related, we do not reach the third party assailant issue in this manner.

Consistent with the foregoing, we

ORDER

AND Now, this 15th day of September, 1976, the order of the Workmen's Compensation Appeal Board which reversed the referee's award of benefits to Julia Weingrad, w/o Leon, deceased, and Barbara Weingrad, natural guardian for Michael and Aaron Weingrad, is hereby affirmed, and benefits in the above captioned matter are hereby denied.

Judge KRAMER did not participate in the decision in this case.